# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

_____

In Re:

**A.W. LOGGING, INC.,**

**Debtor.**

**Bankruptcy Case
No. 05-500**

_____

## MEMORANDUM OF DECISION

_____

**Appearances:**

>  Randal J. French, BAUER & FRENCH, Boise, Idaho, Attorney for Debtor.

>  D. Blair Clark, RINGERT, CLARK, Boise, Idaho, Attorney for Les Bois Leasing.

The Chapter 11 Debtor, A.W. Logging Inc., objects to the proof of claim filed by Les Bois Leasing ("Creditor") for damages under two equipment lease agreements. The Court conducted an evidentiary hearing concerning the objection on May 3 and August 24, 2006, at which the parties submitted evidence and testimony. Written closing arguments were filed. Docket Nos. 182; 184–185.

MEMORANDUM OF DECISION - 1

This Memorandum constitutes the Court's findings, conclusions and disposition of the issues.  Fed. R. Bankr. P.  7052; 9014.

**Facts**

In March 2000, the parties entered into two sixty-month equipment leases (the "Leases"), covering a Povlsen Model 36 Bandmill (the "Sawmill") and a used JCB 505-19 Loadall (the "Loader").  Creditor acquired the equipment and leased it to Debtor.

The total purchase cost for the Sawmill was $52,150.00.  Under the lease, Debtor agreed to pay Creditor ten monthly payments of $1,589.33 each year.  Sawmill Lease, Ex. B.  Debtor was granted an option to purchase the Sawmill for an additional payment of $5,215.00 at conclusion of the lease term.  Addendum to Sawmill Lease, Ex. B.

The total cost for Creditor to acquire the Loader was $28,000.  Debtor agreed to make ten monthly payments of $878.48 each year to Creditor.  Loader Lease, Ex. B.  Debtor could purchase the Loader when the lease concluded for an additional payment of $2,800.00.  Addendum to Loader Lease, Ex. B.

Under the leases, Debtor was required to commence monthly payments beginning in March, with no payments due for the months of January and February of each year during the lease term.  Employing identical provisions,

MEMORANDUM OF DECISION - 2

both leases provided that an additional charge would be imposed for any late monthly payments. Leases, Ex. B. Lease payments were due on the 24th day of the month; they were deemed "late" if not paid within ten days thereafter.

Debtor made payments on both leases through 2004. However, 36 of the payments on the Sawmill lease, and 37 of the payments on the Loader lease, were made "late." Exs. 10, D; 11, D. At that time, a dispute arose between the parties regarding the amount necessary for Debtor to complete the payments under the leases and to exercise its right to purchase the equipment. Debtor and Creditor were unable to resolve this dispute. On February 18, 2005, Debtor filed for relief under chapter 11.

In July 2005, Debtor rejected the equipment leases and stipulated to entry of an order granting Creditor relief from the automatic stay so it could repossess the Sawmill and Loader. Docket No. 53. Creditor took possession of the Sawmill and Loader at Debtor's property, and stored the equipment at a Boise dealer's premises pending sale of the items. Albert Wolske, Debtor's primary stockholder and manager, testified that the Sawmill was operable when it was repossessed by Creditor. However, when Creditor's agents attempted to load the Sawmill on a flatbed truck using a chain and two forklifts, the Sawmill was dropped. As a result, some of the components of the Sawmill, including the

MEMORANDUM OF DECISION - 3

computer that controlled the operation of the mill, were damaged.  In addition, the frame of the Sawmill was bent.

Creditor arranged to sell the equipment through an online auction service known as Iron Planet.  Prior to listing the Sawmill for sale, Iron Planet's agent, Bob Jones, inspected it and determined it was inoperable, in part because of damage to several hydraulic lines and because the battery was dead.  Depo. at 11;24–25, Ex. L.  However, Mr. Jones' overall assessment of the Sawmill was that its condition was as expected given its age and the extent of its use.  Because the Sawmill was inoperable, Mr. Jones did not test the various components of the Sawmill.  The fact that the Sawmill was inoperable and was not tested was disclosed in a report posted on the website as information for potential purchasers.

Ultimately, the Sawmill sold on Iron Planet for a high bid of $10,500.  Ex. 1 of Depo., Ex. L.  The damage to the Sawmill at the time of sale was confirmed in the testimony of Ron Davison, the purchaser.  Prior to bidding, Mr. Davison, who lives in the area, inspected the Sawmill.  He testified that the frame was "not quite straight," but that after he bought it, he was able to straighten it somewhat such that it would operate adequately for his needs.  He welded certain components back onto the Sawmill.  It took some time to complete the

MEMORANDUM OF DECISION - 4

repairs to the Sawmill because parts had to be ordered, but the Sawmill is now operational.

The Loader, also placed for sale on Iron Planet's auction website, sold for a high bid of $15,000.

Debtor contends that if the Sawmill had been operational at the time of sale, it would have sold for a substantially higher price. Debtor presented the testimony of Jack Davis, who has significant experience in the purchase of similar equipment in connection with his employment by Idaho Timber Company. Mr. Davis testified that, based upon his experience, and after looking for similar equipment in the marketplace, it was his opinion that the price range for a comparable sawmill would be between $42,000 and $54,000. Mr. Davis also testified that, as a general rule, if an item of equipment is not operational, he will try to acquire it for approximately half the price of functional equipment.

Creditor first filed its proof of claim in Debtor's bankruptcy case on March 31, 2005. On December 19, 2005, the claim was amended to reflect the new balance due after sale of the leased equipment. Ex. A. In the claim, Creditor asserts Debtor owes it $39,535.21 on the Sawmill lease, and $10,862.37 on the Loader.[1] Ex. A.

---

[1] Creditor also claims $2,926.00 as the balance due on a separate truck lease. Debtor does not object to this component of Creditor's claim, except to the extent it is

MEMORANDUM OF DECISION - 5

Debtor objected to Creditor's claim on several grounds.  Docket No. 104.  It argues that Creditor's claim should be disallowed in its entirety.  In the alternative, Debtor contends that the claim amount must be significantly reduced because Creditor has miscalculated the amount of late fees due under the leases, and to account for the damage that occurred to the Sawmill during repossession.

## Disposition of the Issues

### A.  Applicable Bankruptcy Law.[2]

When a debtor rejects an executory lease, as Debtor did here, the rejection "constitutes a breach of the lease, and the lessor's claim shall be allowed as if such claim had arisen immediately before the date of the filing of the petition."  *In re Bennett*, 92 I.B.C.R. 132, 132 (Bankr. D. Idaho 1992) (citing 11 U.S.C. §§ 365(g)(1), 502(g)).

_____

based upon a promissory note.  Debtor's Closing Argument at 2, Docket No. 182.  Debtor appears to arguing the promissory note was never filed with the Court, resulting in a lack of foundation for the claim.  However, the promissory note is attached to Creditor's Proof of Claim No. 2 which was timely filed on March 31, 2005.  *See* Claims Register, Claim No. 2, Docket No. 05-00500.  Because the promissory note was timely filed as attached to Claim No. 2, the Court will not further address this argument.

[2]  Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001– 9036, in effect prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

MEMORANDUM OF DECISION - 6

Under § 502(a), a creditor's proof of claim is deemed allowed unless a party in interest objects to the claim.

> [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition . . . except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]

11 U.S.C. § 502(b)(1).  The relevant agreements in this case are the leases, and the applicable law is Idaho state law.  *In re Morrow*, 03.2 I.B.C.R. 100, 101 (Bankr. D. Idaho 2003).  The objecting party, here the Debtor, bears the burden of presenting evidence sufficient to overcome the *prima facie* validity of Creditor's claim.  *Id*.  (citing *In re Pugh*, 157 B.R. 898, 901 (9th Cir. BAP 1998)).  Debtor "must present evidence that tends 'to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" *Id.* (quoting *In re Moncur*, 99.2 I.B.C.R. 59, 59 (Bankr. D. Idaho 1999)).  If Debtor succeeds, the burden shifts back to Creditor, who "bears the ultimate burden of persuasion that the claim should be allowed."  *Id.* (citing *Pugh*, 157 B.R. at 901).

**B. Procedural Issues.**

MEMORANDUM OF DECISION - 7

Debtor's original objection to Creditor's claim focused solely on the value of the leased equipment upon repossession. Docket No. 104. But during the presentation of the evidence at the hearing on Debtor's objection, the scope of the proceedings expanded to also include the manner in which the Creditor computed the amount Debtor owed under the leases.[3] In part, the issues broadened because Debtor changed counsel between the time of the first and second day of the hearing.

Evidence and testimony concerning all the issues was presented to the Court by both parties at the hearings. To the extent that some of that evidence concerned matters not specifically addressed in the parties' pleadings, the Court concludes under these circumstances there has been no prejudice to Creditor. Creditor was afforded an ample opportunity to both submit evidence and testimony, and argument, about the issues concerning its calculation of the lease damages. Because resolution of the merits of Debtor's objection will be subserved, and to ensure a just, speedy and inexpensive determination of this dispute, the Court will dispose of all issues raised by the parties regarding both the amount of late charges, and the propriety of Creditor's sale of the equipment, as

---

[3] To the extent Creditor, for the first time, argues in its Closing Brief at 2, Docket No. 184, that Debtor failed to comply with Rule 3007 in objecting to the proof of claim, the Court concludes Debtor did provide notice of the objection to Creditor as required by Rule 3007. *See* Docket No. 104.

MEMORANDUM OF DECISION - 8

both of these issues relate to the amount owed by Debtor to Creditor under the

leases and applicable law.  *See* Fed. R. Bankr. P. 9014(c) (allowing the Court to

apply Rule 7015 to contested matter if parties are afforded a "reasonable

opportunity to comply . . . ."); 1001 (providing that Rules should be construed "to

secure the just, speedy and inexpensive determination of every case or

proceeding."); *See also Liddle v. Drexel Burnham Lambert Group, Inc.* (*In re*

*Drexel Burnham Lambert Group, Inc.*), 159 B.R. 420, 425 (S.D.N.Y. 1993)

(providing regardless of the application of Rule 15 to a contested matter, "[t]he

critical determination is whether the opposing party will be unduly prejudiced by

the amendment." (citations omitted)).

### C.  Late Fees.

Debtor asserts several arguments challenging Creditor's

computations under, and the enforcement of, the late fee provisions of the leases.

Debtor first argues Creditor's interpretation of the late fee provision, and the

manner is which it calculated Debtor's obligation for late fees in this instance, is

incorrect.  Second, Debtor contends Creditor's calculations of the late fees

constitutes a breach of the covenant of good faith and fair dealing, the result of

which should be a denial of Creditor's claim in full.  Third, as an apparent

alternative to the first two arguments, Debtor argues the late fees, as calculated by

MEMORANDUM OF DECISION - 9

Creditor's interpretation of the late charges provision, are unenforceable as

liquidated damages under state law.  Fourth, again alternatively, Debtor asserts the

late charges as calculated by Creditor are unconscionable under Idaho Code § 28-

12-108(1).

Creditor maintains it correctly interpreted the late charge provision

in the parties' agreements, and that its imposition of those charges, and its

calculations contained in its proof of claim, are proper.

**1.  Construction and Interpretation of the Late Fee Provision.**

The late fee clause in the leases is identical and provides as follows:

> If Lessee fails to pay any rental or other charges
> provided for in this Lease within ten (10) days from
> the date due whether by acceleration or otherwise,
> Lessee shall pay Lessor, as agreed liquidated damages,
> an amount equal to five (5%) per cent of the
> delinquent payment.

Leases at 2, ¶ 16, Ex. B.  Creditor interprets this provision to allow it to impose a

late fee equal to five percent of the amount of the monthly payments for each

month a payment remains delinquent.  Debtor interprets this provision to provide

for one-time five percent late fee, regardless of how many months delinquent the

payment becomes.

In the Court's opinion, the language of this provision is unclear and

reasonably susceptible to either of these interpretations.  "Where the terms of a

MEMORANDUM OF DECISION - 10

contract are ambiguous, its interpretation and meaning is a question of fact and extrinsic evidence may be considered in attempting to arrive at the true intent of the contracting parties." *Bergkamp v. Carrico*, 613 P.2d 376, 378 (Idaho 1980) (citations omitted).  If there remains a doubt as to what the intent of the parties is, then "[a]n ambiguity in a written instrument is construed more strongly against the party who drew the instrument especially where one drawing the instrument is a lender of money." *Idaho Falls Bonded Produce & Supply Co. v. Egbert*, 313 P.2d 327, 332 (Idaho 1957); *Farnsworth v. Dairymen's Creamery Ass'n*, 876 P.2d 148, 153 (Idaho App. 1994).

The testimony established that Debtor's officers, who executed the leases, understood and intended that Creditor would be entitled to charge it a late fee if a monthly payment was not timely made.  Debtor's witnesses contend, however, that they understood that regardless of how many months late any particular lease payment may be, that only one five percent late charge would be assessed.  Each monthly lease payment for the Sawmill was to be $1,589.33, and five per cent of that amount is $79.46.  Under this  view, Debtor's agents believed that every time a payment was late, an additional $79.46 would be due as a late fee for that payment, but that the late fee could be imposed only once.

MEMORANDUM OF DECISION - 11

In contrast, Creditor's agent who negotiated and executed the leases, Charles Ver Mett, testified that his understanding of the meaning of this provision was different than that offered by Debtor. As the Court understands his testimony and the other evidence, in calculating the amount due under the leases, Mr. Ver Mett understood the leases allowed Creditor to assess a late fee for each and every month any particular payment was late. The result was to assess an additional late fee each month a payment remained outstanding. For example, if Debtor made a monthly payment two months after the payment was due under the lease, Creditor assessed two late charges of $79.46 each, one for each month the payment was late.

The Court concludes, based upon the evidence, that the meaning of the late fee provision is ambiguous. The evidence of the parties' intent concerning the meaning of the late fee provision is, at best, equivocal. Under the case law, because it is undisputed that Creditor drafted the leases, the Court should construe this provision against Creditor. The Court therefore concludes that the late charge could only be assessed once as to each late payment, regardless of how "late" the payment was made.

According to the calculations presented to the Court by Debtor, there were 36 late payments on the Sawmill Lease and 37 late payments on the Loader

MEMORANDUM OF DECISION - 12

Lease.  A single late fee equal to five per cent of the monthly lease payment could be assessed for each of these late payments.  Thus, Creditor was entitled to $2,860.56 in late fees under the Sawmill lease and $1,625.04 in late fees for the Loader.  *See* Exs. 10–11; D.[4]

## 2.  The Covenant of Good Faith and Fair Dealing.

Under Idaho law, a covenant of good faith and fair dealing is implied in the leases at issue.  *In re Morrow*, 03.2 I.B.C.R. at 101.  That "covenant of good faith and fair dealing may be implied, however, . . . only regarding terms agreed to by the parties, and requires that the parties perform, in good faith, the obligations imposed by their agreement."  *Independence Lead Mines v. Hecla Mining Co.*, 137 P.3d 409, 413 (Idaho 2006) (citing *Lettunich v. Key Bank Nat. Ass'n*, 109 P.3d 1104, 1110 (2005)).

> To the extent the covenant of good faith and fair dealing does apply, this Court has rejected "the amorphous concept of bad faith as the standard for determining whether the covenant has been breached."  *Metcalf v. Intermountain Gas Co.*, 778 P.20 744, 749 (1989).  Instead, "the covenant is an objective determination of whether the parties have acted in good faith in terms of enforcing the contractual

---

[4] The Sawmill monthly lease payment was $1,589.33.  Five per cent of that payment amounts to $79.46.   Thirty-six late charges would total $2,860.56.  Using the same approach for the Loader lease, since each monthly payment was $878.48, the total of 37 late charges would amount to $1,625.04.  These are the total amounts of late charges Creditor could assess under the terms of these leases.

MEMORANDUM OF DECISION - 13

> provisions." *Jenkins v. Boise Cascade Corp.*, 108 P.3d
> 380, 290 (2005).  An objective determination can only
> be made by considering a party's reasonableness in
> carrying out the contract provisions.

*Id.* at 413–14.

Debtor contends Creditor violated the covenant of good faith and fair dealing implied in the leases by inaccurately accounting for the amounts due when Debtors sought payoff information from Creditor.  Again, Debtor's primary complaint with Creditor's accounting is that the late fees were not properly calculated.  Creditor's calculations of the amount due was, as explained above, based upon its interpretation of the late fee provisions of the leases.  While the Court has determined under general rules of contract construction that Debtor's interpretation of the late fee provision was correct, Creditor's interpretation of the provision was also plausible.  While Creditor perhaps deserves some criticism for employing confusing language in its printed contracts, no showing was made that Creditor acted unreasonably or in bad faith in assessing the late fee under these circumstances.  For this reason, the Court concludes Creditor did not breach the covenant of good faith and fair dealing.

### 3. Debtor's Other Arguments.

Debtor acknowledged it agreed to pay a late fee for late lease payments.  Such a provision is common in the commercial setting for what

MEMORANDUM OF DECISION - 14

amounts to a financing transaction. The Court has, in effect, confirmed Debtor's

position on the manner in which late fees were to be calculated, and it will

disallow any charges for excessive charges. However, based upon the record, this

is the extent of the relief to which Debtor is entitled. When the lease provisions

are properly interpreted, the resulting late fees were neither illegal nor

unconscionable under state law.

### D. Disposition of the Equipment.

Under the Bankruptcy Code, rejection of an unexpired lease

constitutes a breach, and entitles the lessor to assert its damages as an unsecured

prepetition claim. *In re Bennett*, 92 I.B.C.R. at 132. Debtor contends that

Creditor's agents damaged the Sawmill during its repossession, and that it failed

to mitigate the resulting decrease in value to the equipment[5] by making necessary

repairs prior to selling the items.[6]

---

[5] During the evidentiary hearing, Debtor also contested Creditor's methods and results obtained in selling the Loader. However, Debtor's closing brief focuses solely on Creditor's handling and disposition of the Sawmill. The Court therefore presumes that Debtor has abandoned its objection to Creditor's disposition of the Loader. Even if Debtor persists, though, the Court concludes the sale of the Loader by Creditor was in fact commercially reasonable. Any complaints Debtor may have about the resulting sale price, in the Court's opinion, are attributable to market factors and the condition of the equipment, and not the result of Creditor's sale methods.

[6] Debtor clarifies it is not arguing whether the sale was commercially reasonable under Idaho Code § 28-9-627, because Article 9 applies to security agreements and this is a lease covered by Article 12. Reply Brief at 3, Docket No. 185. The Court notes that Article 12 (referred to as Article 2A in the Uniform Commercial Code but adopted as

MEMORANDUM OF DECISION - 15

There is no dispute that the Sawmill was operable at the time of its repossession.  Debtor presented testimony that established, during the repossession of the Sawmill, Creditor's agents dropped it, damaging various components and bending its frame.  Mr. Wolske, Debtor's principal, testified that as a  result of the damage the Sawmill could not operate nor cut straight boards.  He also testified that, during the loading process, the computer was broken off the Sawmill, and several hydraulic hoses were damaged or dislodged.  Mr. Wolske contends that had these minor issues been remedied by Creditor prior to the Sawmill's sale on Iron Planet, the Sawmill would have sold for around $40,000.   Because these problems were not addressed,  Bob Jones, Iron Planet's inspector, was unable to check the condition of several components and the Sawmill was sold as inoperable.  As this fact was included in the information posted on the internet website, Debtor contends it chilled the bidding and ultimately caused the Sawmill to sell for less than its market value.

Creditor maintains the sale was reasonable and that had Debtor wanted to ensure a higher price would be received,  Debtor could have been involved with the sale.

---

Idaho Code § 28-12-101 *et seq.*), was amended in 2004.  Therefore, the Leases, executed in 2000, arose under the pre-amendment version of Article 12, and all citations to Article 12 are to its provisions as they existed prior to the 2004 amendments.

MEMORANDUM OF DECISION - 16

State law determines the measure of damages arising from the rejection of an executory lease during a bankruptcy case. *In re Widmier*, 03.4 I.B.C.R. 234, 236 (Bankr. D. Idaho 2003). Article 12 of the Idaho Code governs the parties' rights and duties under the equipment leases. Idaho Code § 28-12-102 (2000). "Under Idaho law, a lessor is required to mitigate any damages sustained by the lessee's breach of a lease by using "commercially reasonable" efforts to either re-lease or sell the property." *In re Widmier*, 03.4 I.B.C.R. at 236 (citing *Indus. Leasing Corp. v. Thomason*, 523 P.2d 916, 919 (Idaho 1974)). This duty to mitigate arises:

> If the lessee notifies the lessor of his intention not to continue the lease, or if the lessor becomes aware of the lessee's intention not to perform the lease by breach or otherwise, and if the leased property is returned to the lessor or made available to the lessor, then the lessor is under a duty to attempt to mitigate the damages sustained by the lessee's breach by re-leasing or selling the property and setting off the amount received against the damages sustained by reason of the lessee's breach of the lease.

*Id.* (quoting *Thomason*, 523 P.2d at 920); *see also* Idaho Code § 28-12-527 (2000) (specifying a lessor's right to dispose of the leased item upon default).

In using the term "commercially reasonable" in its decision, the Idaho Supreme Court presumably intended to employ the same meaning as that prescribed in the Idaho Uniform Commercial Code. *Thomason*, 523 P.2d at 920

MEMORANDUM OF DECISION - 17

n. 4.  This Court may therefore consult the Idaho Uniform Commercial Code, and

cases interpreting its provisions, for guidance as to what constitutes a

commercially reasonable sale so as to satisfy Creditor's duty to mitigate its losses

upon repossession of the Sawmill.

The Idaho Uniform Commercial Code, in Article 9, requires a

creditor to "dispose of any or all of the collateral in its present condition or

following any commercially reasonable preparation or processing."  Idaho Code

§ 28-9-610(a).  Official Comment 4 to this section provides that in some

circumstances, a secured party may be required to "prepare or process"

repossessed collateral for sale to qualify as commercially reasonable, but that

courts "should not be quick" to impose such a duty.  Clearly, the Comment

anticipates that circumstances may arise that require the creditor to repair

collateral in order for the sale to be commercially reasonable.  Considering the

lessor's duty to mitigate its damages in a commercially reasonable manner, it also

seems clear that if repairs to repossessed goods are reasonably necessary to

mitigate damages, Idaho law requires such.

Under Idaho law it is the repossessing creditor's burden to

demonstrate the collateral was disposed of in a commercially reasonable manner.

*Butte County Bank v. Hobley*, 707 P.2d 513, 515 (Idaho App. 1985) (citing *Mack*

MEMORANDUM OF DECISION - 18

*Financial Corp. v. Scott*, 606 P.2d 993 (1980)).  If the court concludes the sale

was not conducted in a commercially reasonable manner,

> it will be presumed that the fair market value of the
> collateral at the time of repossession was equal to the
> debt.  If unrebutted this presumption will deny the
> secured party a deficiency judgment.  The burden is
> then on the secured party to prove by competent
> evidence the fair market value of the collateral at the
> time of repossession.

*Id.* (citing *Mack Financial Corp.*, 606 P.2d at 996).  *See also, Snake River*

*Equipment Co. v. Christensen*, 691 P.2d 787, 791 (Idaho App. 1984) (applying

this standard).  However, if the creditor presents adequate proof as to the market

value of the collateral to rebut the presumption, that creditor is entitled to a

deficiency judgment.  *Butte County Bank*, 707 P.2d at 516.

The Court will now consider in turn each of Debtor's contentions

regarding the reasonableness of the resale of the repossessed equipment in this

case.

### 1.  Use of Iron Planet as the Auction Website.

Debtor argues that Creditor's use of Iron Planet to auction the

equipment was not commercially reasonable.  In his testimony, Mr. Wolske

expressed his belief a better result would have been obtained by using an auction

website devoted specifically to this type of equipment, called the "Sawmill

MEMORANDUM OF DECISION - 19

Exchange." As the Court understands this testimony, then, Debtor's concern is not that the equipment was sold via the internet, but with the particular online auction service selected by Creditor to conduct the sale.

The evidence showed that Iron Planet is a well-respected auction website that specializes in the sale of heavy equipment. While perhaps potential purchasers would first consult the sawmill sale site, the Court is not persuaded that, by listing the equipment for sale on the Iron Planet site, the Sawmill was not exposed a to broad market. The fact that several bids were placed indicates individuals looking to purchase this type of equipment utilize the Iron Planet website. While Debtor would have preferred a different electronic auction service be utilized, under these circumstances, the Court concludes Creditor has met its burden of showing that the sale of the Sawmill on Iron Planet, a website specializing in heavy equipment auctions, was reasonable.

### 2. Failure to Repair the Sawmill.

That Creditor damaged the Sawmill while repossessing it and then failed to repair it prior to sale raises serious concerns, in the Court's opinion. During the hearing, Creditor took care to establish that any repairs needed as a result of the damage to the Sawmill during repossession would be minor, not particularly expensive, and could be accomplished quickly. Thus,

MEMORANDUM OF DECISION - 20

Creditor argues, the fact that such repairs were needed would not have greatly

impacted the price for which the Sawmill sold.  In contrast, there is no dispute that

as a result of Creditor's repossession, the Sawmill was rendered inoperable.

Creditor bears the burden to prove that the repossession sale, without

making repairs, was reasonable.  Debtor presented testimony that comparable,

operable sawmills, could be expected to command a price of somewhere between

$42,000-$54,000.  However, the Court regards this opinion with some skepticism,

considering that over five years ago the Sawmill was purchased by Creditor for

$52,000.  The Court questions the notion that the equipment has suffered little

significant depreciation in value.

In addition, Debtor's expert testified that he did not believe there was

$20,000 worth of damage done to the Sawmill during repossession, but that he had

not viewed the Sawmill after repossession.  The other testimony and evidence

established that any necessary repairs were minor.  Mr. Jones, the Iron Planet

inspector, indicated the Sawmill's condition was as expected for its age and use.

Mr. Davison, the purchaser, testified that he knew he could make the Sawmill

operable, and intimated that doing so was not difficult, only time-consuming to

order the necessary parts.  Mr. Davison did not testify that he paid less for the

MEMORANDUM OF DECISION - 21

Sawmill because of its inoperable condition, nor did he testify about the cost of the repairs required to put the Sawmill in operating condition.

There were multiple bids placed for the Sawmill. Because the necessary repairs were minor, and because the purchaser testified he believed the Sawmill could be easily repaired at the time he bid on it, the Court concludes Creditor demonstrated that the sale, without the repairs, was commercially reasonable. Debtor is correct in asserting Creditor had the duty to mitigate its damages, and under Idaho law, the duty to mitigate encompasses an obligation to dispose of the repossessed equipment in a commercially reasonable manner. Here, Creditor established that the needed repairs were minor and did not significantly impact the Sawmill's value. The Court concluded above that the manner of sale, an auction on Iron Planet, was commercially reasonable. Thus, the Court is constrained to conclude that Creditor's sale of the Sawmill without making the repairs was commercially reasonable.

Moreover, the Court was not provided with any indication as to the cost of the required repairs, beyond that it was minimal. Considering the Sawmill was damaged, and repairs were necessary, because they were caused by Creditor's repossession agents, the Court likely would have held Creditor responsible for the cost of repair had competent evidence of the costs of repairs been presented. But

MEMORANDUM OF DECISION - 22

no estimate of the costs of repairs was submitted, nor did Mr. Davison testify that

he reduced his bid for the equipment because of the need to repair the Sawmill.

Since the Court is not free to speculate about such important facts, the Court is

unwilling to offset any amount as against Creditor's claim for the repair costs.

### D.  Attorney Fees.

Creditor seeks attorney fees totaling $4,000 in its proof of claim.

Debtor objects, arguing there is no basis under either the statutes or the parties'

contracts for recovery of such fees, and that no showing was made by Creditor to

support the reasonableness of the fees.

Contrary to Debtor's objection, the parties' lease agreements provide

that Debtor is responsible for "reasonable attorney fees and all court costs incurred

by lessor in the enforcement of this Lease."  Leases at 2, ¶ 12(d), Ex. B.  Creditor

included a $2,000 attorney fee with its itemized costs of repossession of the

Sawmill and the Loader individually.  However, Creditor made no showing that

such fees were reasonable, or whether the fees were incurred prepetition or

postpetition.   Creditor bears the ultimate burden of proof as to the amount of its

claim.  *In re Morrow*, 03.2 I.B.C.R. at 101 (citing *Pugh*, 157 B.R. at 901).

Although the Leases provided for attorney fees, Creditor failed to provide any

factual support for charging Debtor $2,000 in attorney fees per lease to enforce

MEMORANDUM OF DECISION - 23

both the Loader and Sawmill Leases.  Creditor did not meet its burden and the

Court concludes the $4,000 in attorney fees must be excluded from the proof of

claim.

### E.  Amount of Claim.

#### 1.  The Sawmill Lease.

Under the lease, Debtor was obligated to make 50 payments of

$1,589.33 each, for a total of $79,466.50.  Sawmill Lease, Ex. B.  Debtor and

Creditor agree that through 2004, Debtor had paid Creditor $63,739.57.  Exs. 10,

D.  Thus, at the end of 2004, before the bankruptcy filing in February 2005, there

was a remaining balance due of $15,726.93.  In addition to the balance due, as

discussed above, Debtor is responsible for late payment fees in the amount of

$2,860.56, returned check charges of $240 and additional costs associated with the

repossession and sale of the Sawmill amounting to $4,437.00.[7]  Thus, the balance

due to Creditor under the lease is $23,264.49.[8]

---

[7]  These additional costs are included in the amended proof of claim and Debtor
did not object to them.  The costs are: $350.00 booking fee; $942.00 commission; $1,600
to replace axle; $740.00 for storage; and $805.00 recovery fee = $4,437.00.

[8]  $15,726.93 remaining balance due + $2,860.556 late charges + $240 returned
check fees + $2,000 attorney fees + 4,437.00 additional costs = $25,264.49.  The Court
does not include the $5,215.00 required for Debtor to purchase the equipment at the end
of the lease term because Debtor was in default, the lease was rejected,  and the
equipment was repossessed, not retained by Debtor.   Addendum to Sawmill Lease, Ex.
B.

MEMORANDUM OF DECISION - 24

Creditor received $10,500 from the sale of the Sawmill which must be credited against this balance. Additionally, Mr. Wolske testified that he performed services for Creditor by driving to Wyoming to retrieve two trailers. Mr. Wolske testified Creditor agreed he was to receive a $1,935.00 credit against what he owed Creditor for his services. Mr. Wolske's testimony on this matter was credible and no such credit appears in Creditor's record of payments. *See* Ex. D. This amount will therefore be credited against the amount Debtor owes on the Sawmill. Finally, the lease required Debtor make a security deposit in the amount of one monthly payment. Sawmill Lease at 2, ¶ 23. The lease provides, "[i]n the event of default, said deposit shall be retained by Lessor and may be applied by Lessor to the obligations of the Lessee." *Id.* After reviewing Creditor's computation of the amount due, Ex. D, it does not appear that any credit was given for this security deposit. Therefore, the Court also deducts from the amount due, the security deposit in the amount of one monthly payment, $1,589.33.

Based upon the evidence, and its calculations discussed above, the Court concludes Creditor holds an allowed unsecured claim in the amount of $9,240.16 on the Sawmill lease.[9]

## 2. The Loader Lease.

---

[9] $23,264.49-$10,500.00-$1,935.00-$1,589.33 = $9,240.16.

MEMORANDUM OF DECISION - 25

Under the Loader Lease, Debtor was obligated to make 50 payments of $878.48 each to Creditor, for a total of $43,924.00.  Loader Lease, Ex. B.  The parties agree that through 2004, Debtor made payments totaling $35,521.79.  Exs. 11, D.  This left an outstanding balance due on the Loader of $8,402.21.[10]  In addition to the outstanding balance, Debtor owes Creditor $1,625.04 in late fees, $150.00 for returned check fees, and $792.50 in fees related to repossession and storage of the Loader, for a total amount due of $10,969.75.

Creditor received $15,000 from the sale of the Loader.  Thus, the claim was paid in full.  Therefore, Creditor is entitled to no further recovery on this lease.  This component of it's claim will be disallowed.[11]

## Conclusion

For the reasons discussed above, the Court concludes Creditor is entitled to an allowed unsecured claim in the amount of  $9,240.16 under the Sawmill lease.  Creditor's claim for amounts due under the Loader lease will be disallowed.   As noted above, Debtor did not contest Creditor's claim of $2,926.00 as

---

[10]  Again, for the reasons discussed above, the Court excludes the optional payment to purchase the Loader for the for $2,800.00.  Addendum to Loader Lease, Ex. B.

[11]  "The lessor [Creditor] is not accountable to the lessee [Debtor] for any profit made on any disposition."  Idaho Code § 28-12-527(5) (2000).

MEMORANDUM OF DECISION - 26

the balance due on the lease of the truck.  This component of Creditor's claim shall also

be allowed.

A separate order will be entered.

Dated:  October 4, 2006

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 27